OPINION OF THE COURT
LEWIS, Circuit Judge.
Appellees/cross-appellants are 23 of 28 former yard and clerical employees of Pennsylvania Truck Lines, Inc. (“PTL”) who asserted that appellant/cross-appellee Pacific Rail Services (“Pacific Rail”) engaged in age discrimination in violation of the New Jersey Law Against Discrimination (the “LAD”) by failing to hire them in 1990. Since the trial in this case, the United States Supreme Court has issued a decision clarifying the standards by which federal employment discrimination cases are to be judged. St. Mary’s Honor Ctr. v. Hicks, — U.S. -, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Because we believe the New Jersey Supreme Court would adopt Hicks’s clarification of the test to be applied in federal discrimination eases in interpreting the LAD, we will vacate the judgment that was entered and remand for a new trial. To assist the district court on remand, we will also decide several subsidiary issues relating to individual claims and plaintiffs.
I.
Because our resolution of the legal issues will require a new trial, it is not necessary to discuss the facts in great detail. The following, however, provides some background to the dispute.
Beginning in 1960, PTL performed lift operations — loading and unloading freight from flat bed railroad cars — for Consolidated Rail Corporation (“Conrail”) at its North Bergen, New Jersey, terminal. In July, 1990, however, after solicitation of bids by Conrail, Pacif-ie Rail won the North Bergen contract, effective September 1, 1990.
Upon learning that PTL had lost the North Bergen contract, PTL employees at the North Bergen terminal became interested in working for Pacific Rail at that site. Pacific Rail representatives testified at trial, however, that even before submitting its bid, Pacific Rail had decided not to simply hire all of the PTL/North Bergen yard and clerical workers “wholesale,” because Pacific Rail was concerned about the attitudes and work habits of some of the workers.[1]
Instead, upon winning the North Bergen contract, Pacific Rail apparently undertook a three-step hiring process. First, Pacific Rail offered positions to its own employees at Conrail’s Elizabeth, New Jersey (“E-Rail”) terminal on a “promote from within” theory. (Pay rates at North Bergen were higher than at E-Rail, so a move to North Bergen was effectively a promotion, according to the Pacific Rail representatives.) Testimony indicated that one of the six yard and clerical employees transferred from E-Rail on this basis was over 40 years old.
Pacific Rail next offered employment to three Conrail clerks and two PTL employees from the nearby Conrail/PTL terminal at Kearny, New Jersey. The three Conrail of-ferees (only two of whom accepted their offers) were over 40. The two PTL offerees (both of whom accepted) were under 40.
Finally, Pacific Rail hired all 11 applicants referred by the union local that represented yard and clerical employees at E-Rail. Of these, one was over 40.
As of September 1, only a limited number of positions in North Bergen remained open. Pacific Rail apparently offered employment to two former PTL/North Bergen yard employees who were over 40, but both refused the offer. Then a former PTL supervisor working for Pacific Rail recommended for hire four former PTL/North Bergen yard employees, two of whom were in their 20s and two of whom were over 40. Pacific Rail *825 offered employment to the younger two, and they accepted. To fill a remaining clerk position, Pacific Rail made offers to two former PTL/North Bergen clerical employees, both over 40, but both declined. Ultimately, instead of simply filling the clerk position, Pacific Rail transferred a person who was over 40 from E-Rail to assist with clerical work and act as office manager.
To summarize, prior to September 1, Pacific Rail had apparently hired 21 employees, none of whom came from the pool of PTL employees at North Bergen. Only four of these 21 individuals were over 40 years old. After September 1, Pacific Rail hired either three or four more employees, at least two of whom were under 40 and from PTL/North Bergen and at least one of whom was over 40 and formerly with E-Rail.[2] Thus, of the 25 yard and clerical employees that the evidence showed Pacific Rail hired to work at North Bergen, either 19 or 20 were under 40 years old.
The 28 former PTL/North Bergen yard and clerical employees who filed this lawsuit were over 40. They alleged that Pacific Rail’s failure to hire them was due to age discrimination in violation of the LAD. A jury found in favor of 18 of the 28 employees and awarded them a total of more than $7 million ($1,448,000 in back pay and $5,743,500 in front pay). Both Pacific Rail and the 18 verdict winners, plus five plaintiffs whose claims were dismissed by the district court, appeal and cross-appeal several issues.
II.
The primary issue presented involves the delicate task of predicting how the New Jersey Supreme Court would interpret and apply the LAD in the aftermath of the United States Supreme Court’s decision in St. Mary’s Honor Ctr. v. Hicks, — U.S. -, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). As a federal court sitting in diversity, the district court was, and we are, obliged to apply state substantive law. Erie R.R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); Colantuno v. Aetna Ins. Co., 980 F.2d 908, 909 (3d Cir.1992). In so doing, we are not free to impose our own view of what state law should be; we are to apply state law as interpreted by the state’s highest court. Id. In the absence of guidance from that court we are to refer to decisions of the state’s intermediate appellate courts for assistance in determining how the highest court would rule. Fleck v. KDI Sylvan Pools, Inc., 981 F.2d 107, 113 (3d Cir.1992); Fisher v. USAA Casualty Ins. Co., 973 F.2d 1103, 1105 (3d Cir.1992). In cases such as this, where neither the state supreme court nor any intermediate appellate courts have spoken to the issue at hand, our task of predicting state law becomes even more complicated. Nevertheless, we must proceed into these uncharted waters, using pronouncements from the New Jersey Supreme .Court on analogous issues as our compass.
A.
In Hicks, the Supreme Court considered “whether, in a suit against an employer alleging intentional racial discrimination in violation of [Title VII], the trier of fact’s rejection of the employer’s asserted reasons for its actions mandates a finding for the plaintiff.” Hicks, — U.S. at-, 113 S.Ct. at 2746. Under the familiar McDonnell Douglas shifting-burden analysis applicable to federal employment discrimination cases involving indirect proof of discrimination, the plaintiff bears the burden of proving a relatively simple prima facie ease, which the employer must rebut by articulating a legitimate, non-discriminatory reason for its actions. See generally Chipollini v. Spencer Gifts, Inc., 814 F.2d 893, 897 (3d Cir.1987).[3] *826 Prior to Hicks, we had held that a finding that a defendant employer had articulated false reasons mandated entry of judgment for plaintiff. See Chipollini, 814 F.2d at 898; Duffy v. Wheeling Pittsburgh Steel Corp., 738 F.2d 1393, 1395-96 (3d Cir.1984). Hicks changed that: the Court ruled definitively that a finding that an employer had articulated a pretextual reason for its actions does not mandate judgment for a plaintiff. Instead, “a reason cannot be proved to be ‘a pretext for discrimination’ unless it is shown both that the reason was false, and that discrimination was the real reason.” Hicks, — U.S. at -, 113 S.Ct. at 2752. Thus, “[tjhat the employer’s proffered reason [for its actions] is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiffs proffered reason of race is correct.” Id. at -, 113 S.Ct. at 2756 (emphasis added). In our most recent decisions addressing this issue, we have followed this teaching that a finding of pretext may lead to a reasonable inference of discriminatory motives, but it does not automatically compel a finding of discrimination. See Miller v. CIGNA Corp., slip op. at 19-20, No. 93-1773, 1994 WL 283269 (3d Cir. June 28, 1994); Seman v. Coplay Cement Co., 26 F.3d 428, 432-33 (3d Cir. June 8, 1994); Geary v. Visitation of the Blessed Virgin Mary Parish Sch., 7 F.3d 324, 329 n. 4 (3d Cir.1993).
B.
In this LAD case, the district court instructed the jury several times that the plaintiffs bore the burden of proving that they were not hired because of their age. See App. at 91-93. The court also instructed the jury that in evaluating Pacific Rail’s asserted legitimate business reasons for its actions, they were to decide whether those reasons were its true reasons or whether they “ha[d] been presented to hide or avoid disclosure of the true reason, namely: age discrimination.” App. at 94. In summarizing the charge, the court said:
If I may recap for you, if you find that plaintiff has established ... either, one, that his/her age was a determining factor “but for” which he/she would have been hired; or two, that the reasons advanced by the defendant for not hiring plaintiff were a pretext, a reason or reasons unworthy of credence, then plaintiff will have established his/her claim of intentional age discrimination and you must return a verdict in his/her favor. If, however, he/ she has failed to establish either of those two propositions, then your verdict must be in favor of the defendant.
App. at 94-95 (emphasis added). Clearly, these instructions would be an incorrect statement of federal law after Hicks.[4]
C.
The question, however, is whether the New Jersey courts would apply Hicks in an LAD ease.[5] Hicks, of course, involved the *827 United States Supreme Court’s interpretation of federal anti-discrimination statutes and case law. Whether the New Jersey Supreme Court will decide that the same principles apply in cases brought under the LAD is another question.
The LAD provides:
It shall be an unlawful employment practice, or, as the case may be, an unlawful discrimination:
a. For an employer, because of the race, creed, color, national origin, ancestry, age, marital status, affectional or sexual orientation, sex or atypical hereditary cellular or blood trait of any individual, or because of the liability for service in the Armed Forces of the United States dr the nationality of any individual, to refuse to hire or employ or to bar or to discharge or require to retire, unless justified by lawful considerations other than age, from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment. ...
N.J.StatAnn. 10:5-12(a). First enacted in 1945, well before federal legislative attempts to eliminate discrimination in the workplace, the LAD was intended by the New Jersey legislature to eradicate “the cancer of discrimination.” Jackson v. Concord Co., 54 N.J. 113, 124, 253 A.2d 793, 799 (1969); see Lehmann v. Toys ‘R’ Us, Inc., 132 N.J. 587, 600, 626 A.2d 445, 451 (1993).[6] The New Jersey Supreme Court has generally looked to standards developed under federal anti-discrimination law for guidance in construing the LAD. Lehmann, 132 N.J. at 600, 626 A.2d at 452. The New Jersey Court has adopted the McDonnell Douglas framework, although it has noted that it has never “embraced the McDonnell Douglas test literally, invariably, or inflexibly.” Grigoletti v. Ortho Pharm. Corp., 118 N.J. 89, 97-98, 570 A.2d 903, 907 (1990). Instead, the New Jersey Supreme Court has demonstrated a marked willingness, and has instructed New Jersey courts in general, to treat the McDonnell Douglas test as “only a general framework for analyzing unlawful discrimination claims” which “must be modified where appropriate.” Erickson v. Marsh & McLennan Co., Inc., 117 N.J. 539, 550, 569 A.2d 793, 799 (1990); see generally Carrington v. RCA Global Commun., Inc., 762 F.Supp. 632, 644-45 (D.N.J.1991) (noting that “[tjhere is little *828 reason to believe that New Jersey courts will exhibit slavish devotion to federal law in interpreting the NJLAD”).
Thus, the New Jersey Supreme Court has refused to apply the McDonnell Douglas framework in LAD cases alleging gender discrimination in the form of unequal pay, Grigoletti, supra; modified the elements of the McDonnell Douglas prima facie ease in the context of reverse discrimination failure-to-hire cases, Erickson, supra; and shifted to employers the burden of proving the validity of their decisions in some handicap discrimination cases. Jansen v. Food Circus Supermarkets, Inc., 110 N.J. 363, 541 A.2d 682 (1988). See also Jamison v. Rockaway Twp. Bd. of Educ., 242 N.J.Super. 436, 445-47, 577 A.2d 177, 183 (1990) (establishing a variation of the McDonnell Douglas framework to apply in cases alleging a retaliatory failure to promote). Plaintiffs point to this willingness to modify the McDonnell Douglas framework as evidence that the New Jersey Supreme Court would disregard Hicks and instead hold that a plaintiff asserting a claim of employment discrimination pursuant to the LAD is entitled to judgment as a matter of law if he or she has proven a prima facie case and has demonstrated that the reason or reasons the employer gave for the challenged employment action were false.
It is true that the New Jersey Supreme Court has taken to heart the legislature’s expressed intention that the LAD is to be construed liberally. See supra note 6. It is also true, however, that the legislature has admonished New Jersey courts to construe the provisions of the LAD “fairly and justly with due regard to the interests of all parties,” N.J.Stat.Ann. 10:5-27, as the New Jersey Supreme Court itself recognized in Andersen v. Exxon Co., 89 N.J. 483, 496, 446 A.2d 486, 492 (1982). Read together, these admonitions are not inconsistent with one another and are both significant to and instructive in our search for guidance. As we explain more fully below, because the New Jersey legislature intended to protect and compensate victims of discrimination but not to relieve them of the burden of proving unlawful discrimination, and because the New Jersey rule regarding presumptions parallels the federal rule on presumptions upon which the Hicks Court based its decision, we predict that the New Jersey Supreme Court would endorse Hicks’s view that a plaintiff in a discrimination case is not entitled to judgment as a matter of law simply because he or she proves a prima facie case and that the reason or reasons asserted by his or her employer for the challenged action were false.
Our decision is informed by a number of observations concerning New Jersey law. First, under New Jersey law, as under federal law, plaintiffs have always retained the ultimate burden of demonstrating that the actions they challenged were due to discrimination. See, e.g., Peper v. Princeton Univ. Bd. of Trustees, 71 N.J. 55, 87, 389 A.2d 465, 478 (1978); Kearny Generating Sys. v. Roper, 184 N.J.Super. 253, 445 A.2d 1159 (1982).[7] *829 Our understanding of the McDonnell Douglas framework before Hicks similarly required that the plaintiff bear the ultimate burden of proving that the challenged employment action resulted from unlawful discrimination. See, e.g., Billet v. CIGNA Corp., 940 F.2d 812, 817 (3d Cir.1991). Our decisions finding that this burden could be borne merely by demonstrating that the asserted legitimate, non-discriminatory reasons for the employer’s actions were incredible were based on the weight given to the McDonnell Douglas prima facie case as a “presumption.” In other words, our (and other court’s) reasoning that proving pretext entitled plaintiff to judgment reflected a belief that the presumption of discrimination raised by the plaintiff’s ability to make out a prima facie case had not been rebutted and was only strengthened by the proven falsity of the reasons the employer gave for its actions, thus mandating a decision that the employer’s actions had been motivated by unlawful discrimination. See Hicks, — U.S. at ---, 113 S.Ct. at 2762-63 (Souter, J., dissenting). Hicks clarified that under federal law the presumption raised by establishment of the prima facie case no longer exists once an employer has articulated a legitimate, nondiscriminatory reason for its actions. It does not hold that proving that reason false will never suffice to support a decision for a plaintiff; it merely establishes that the plaintiff does not merit judgment as a matter of law once falsity is proven.
In thus clarifying the law, the Court in Hicks referred to and relied upon Federal Rule of Evidence 301, concerning presumptions.[8] Hicks, — U.S. at -, 113 S.Ct. at 2747; see also id. at -, 113 S.Ct. at 2749 (“[T]he Court of Appeals’ holding that rejection of the defendant’s proffered reasons compels judgment for the plaintiff disregards the fundamental principle of Rule 301 that a presumption does not shift the burden of proof, and ignores our repeated admonition that the Title VII plaintiff at all times bears the ‘ultimate burden of persuasion.’ ”). The New Jersey Supreme Court has similarly interpreted the LAD, describing the prima facie stage of the McDonnell Douglas test as establishing a “rebuttable presumption” of discrimination. Erickson, 117 N.J. at 551, 569 A.2d at 799. It has also stated that when a defendant rebuts the presumption by articulating a legitimate nondiscriminatory reason for its actions, the inference of discrimination which literally arose from the plaintiffs evidence is destroyed. Goodman v. London Metals Exch., Inc., 86 N.J. 19, 33, 429 A.2d 341, 348 (1981). Therefore, corresponding reference to the New Jersey Rule of Evidence regarding presumptions seems appropriate, and our reference thereto provides further support for the conclusion that New Jersey would clarify the law of the LAD as the Court in Hicks clarified Title VII jurisprudence.
Like Federal Rule of Evidence 301, New Jersey Rule of Evidence 301[9] provides *830 that the introduction of evidence to rebut a presumption destroys that presumption, leaving only that evidence and its inferences to be judged against the competing evidence and its inferences to determine the ultimate question at issue (in an LAD case, the question of whether the defendant illegally discriminated against the plaintiff). Specifically, it states that “[i]f evidence is introduced tending to disprove the presumed fact, the issue shall be submitted to the trier of fact for determination unless the evidence is such that reasonable persons would not differ as to the existence or nonexistenee of the presumed fact.” The commentary to the rule provides that “a valid presumption can be used to establish a prima facie case, but the presumption normally disappears in the face of conflicting evidence. Nevertheless, any logical inference which can be drawn from the basic fact remains.” N.J.R.Evid. 301, 1994 supplemental comment.[10] Therefore, the rule states with regard to state law exactly what Hicks has explained to be the operation of federal anti-discrimination law under the McDonnell Douglas shifting burden analysis. The New Jersey Supreme Court may choose, as a policy matter, to interpret the LAD even more broadly, so that the usual rules governing presumptions do not apply in LAD eases, cf. N.J.R.Evid. 301 (rule governs “[ejxcept as otherwise provided ... by other law”), but in the face of this explicit explanation of the operation of presumptions under New Jersey law, we cannot make that state law policy decision for it. Compare Schweigert v. Provident Life Ins. Co., 503 N.W.2d 225, 288-29 (N.D.1993) (refusing to adopt Hicks formulation because of different state rule on presumptions).
This is particularly true in light of the New Jersey courts’ general adoption of federal anti-discrimination law as their guidepost. Indeed, the courts’ willingness to depart from federal precedent in the anti-discrimination area has occurred in only three contexts, involving either modification of the McDonnell Douglas framework to fit specific factual situations (e.g., Erickson and Jansen ), departure from that framework in accordance with cases decided by various federal courts of appeals (Grigoletti), or departure from the standards we apply in favor of what it believes to be a more sensible interpretation of United States Supreme Court precedent (Lehmann). It has never rejected outright the United States Supreme Court’s approach to federal anti-discrimination law; to the contrary, it has noted that there exists “an. imputed but strong legislative intent to harmonize the State’s anti-discrimination statutes with the dominant federal view to maximize the protections for the victims of discrimination and ... to benefit all of society by these efforts.” Grigoletti, 118 N.J. at 108, 570 A.2d at 913.
Finally, the New Jersey Supreme Court’s decision in Goodman provides further support for our decision, if only by implication. In Goodman, the court considered a case in which a company and its principals argued that a hearing examiner in the New Jersey Division on Civil Rights had misapplied the burden of proof. The complainant, a female job applicant, established a prima facie case that she had not been hired because of her gender. The respondents contended that she was not granted an interview because her attitude had been unpleasant. The hearing examiner nevertheless ruled for the complainant, stating that the “‘case ultimately turns on credibility’ ” and that he believed the complainant. Goodman, 86 N.J. at 33, 429 A.2d at 348. The New Jersey Supreme Court ruled that the hearing examiner had properly applied the McDonnell Douglas shifting burden scheme:
The explanation given by respondents for complainant’s rejection was sufficient for the employer to meet its burden of articulating a legitimate nondiseriminatory reason for the rejection and thus destroy ‘the legally mandatory inference of discrimination arising from the plaintiffs initial evidence.’ ... However, the trier of *831 fact may nevertheless be persuaded by that evidence and its inferences combined with that adduced from the respondents that the employer’s proposed explanation is unworthy of belief and is nothing more than a mere pretext for unlawful discrimination.
Goodman, 86 N.J. at 33, 429 A.2d at 348 (emphasis added). In explaining why it believed the hearing examiner had correctly applied McDonnell Douglas, the court stated not only that the hearing examiner had said he found the plaintiff and her witness to be truthful, but also that he had “concluded that the reason given by the employer for [the plaintiffs] rejection was pretextual and that the true reason for her rejection was ‘because she was a woman.’” Id. at 33-34, 429 A.2d at 349 (emphasis added). Thus, the New Jersey Supreme Court did not find that mere disbelief of the employer would support a decision for the complainant; it affirmed the hearing examiner’s decision because he had disbelieved the employer and had decided that the true reason for the employer’s failure to hire the plaintiff was unlawful discrimination. This is consistent with Hicks and supports our belief that the New Jersey Supreme Court would follow Hicks in interpreting the LAD.
In conclusion, we are persuaded that the New Jersey Supreme Court would ultimately determine that plaintiffs in employment discrimination cases under the LAD may not necessarily prevail merely by proving a pri-ma facie case and rebutting an employer’s asserted legitimate non-discriminatory reasons for its actions. That level of proof may suffice if the factfinder believes that the employer offered false reasons to conceal unlawful discrimination, but it does not mandate entry of judgment for the plaintiff. Instead, as provided in the New Jersey Rule of Evidence governing presumptions and their operation, the case must go to the factfinder for decision of the ultimate issue — whether the employer had engaged in unlawful discrimination. Thus, the trial court erred in propounding jury instructions that would entitle the plaintiffs to judgment if they merely presented a prima facie case and demonstrated that the defendant’s asserted grounds for decision were pretextual.
III.
Our conclusion that the New Jersey Supreme Court would incorporate the Hicks principles into its LAD jurisprudence requires that this case be retried. We do not believe that the New Jersey Supreme Court would choose to apply this clarification of New Jersey law only prospectively, as the PTL employees argue.[11] Nor do we accept either side’s contention that this case can be decided at the appellate level, without a remand.
Plaintiffs argue that the trial court’s charge to the jury, instructing that they at all times bore the burden of proving that they were not hired because of their age, cured any error that may have occurred when the court instructed that they would win if they had proven that the reasons Pacific Rail advanced for failing to hire them were false. We cannot agree, for while the trial court correctly placed the burden of proving illegal discrimination on the plaintiffs at all times, the statement rendered incorrect in light of Hicks was direct and explicit and served to summarize the charge for the jury. If there was any portion of the charge that guided the jury’s deliberations, it was more than likely the portion we have held to be erroneous.
On the other hand, Pacific Rail contends that we need not remand this case but instead may enter judgment for it because the evidence was insufficient to support a verdict *832 in the plaintiffs’ favor even under an appropriate charge. We cannot agree with this contention, either. Undeniably, plaintiffs’ evidence was aimed mainly at proving pretext, but that evidence, viewed in the light most favorable to the verdict winner (Billet, 940 F.2d at 817), could conceivably have supported a decision for the plaintiffs under the correct charge.
In light of our inability to divine whether the jury’s verdict was premised on correct or erroneous portions of the charge, we will remand the case for retrial under the principles we have set forth above.
rv.
Some of the issues the parties have raised have been rendered moot by our decision thus far.[12] Others, however, remain, for they determine whether certain claims are still properly at issue in this case and thus whether they should be addressed on remand.
A.
Among these is a question which arose after trial as to whether the plaintiffs were entitled to front pay awards. Plaintiffs stated in their complaint that they sought “a judgment ordering defendant to offer them employment and to pay back wages, compensatory damages, punitive damages and attorneys’ fees.” App. at 14. They alleged that as a result of Pacific Rail’s actions they had “lost income and otherwise suffered the effects of discrimination on account of their age,” App. at 20, and sought judgment “[ordering defendant to offer employment to plaintiffs and make them whole for all wages and benefits lost by reason of defendant’s unlawful discrimination; granting compensatory damages to plaintiffs; ... and [granting any further relief the Court deems just and proper.” Id. at 21. The final pretrial order, upon which the parties collaborated and which the magistrate judge handling pretrial matters reviewed and entered, said only that “[a]s a result of defendant’s actions, plaintiffs have lost income and otherwise suffered the effects of discrimination on account of their age.” Id. at 42. They were ordered to quantify their damages by March 16, 1992 (id.), but they did not do so. The first mention of “front pay,” or compensation for future lost earnings, surfaced two weeks pri- or to trial, when plaintiffs submitted proposed jury instructions requesting an instruction on front pay. Id. at 2689, 2702. Over an objection from Pacific Rail, the district court decided to charge on front pay, but after the jury returned a verdict of more than $5 million in front pay, the court granted a post-trial motion to strike the front pay award.
In light of the way this ease developed, the district court did not abuse its discretion in striking the plaintiffs’ front pay award as a sanction for having failed to claim front pay prior to two weeks before trial (and even then only to mention it in proposed jury instructions, which included many items not at issue). Plaintiffs argue that their request for “compensatory damages” encompasses an award of future lost earnings, but in the context of the pleadings filed in this case, we cannot say that their vague pleading style— even under the lenient rules of notice pleading — sufficed to put Pacific Rail on notice of a claim for front pay. Moreover, had there been any question, the plaintiffs had every opportunity to clarify the damages they sought in the pretrial order. When they failed to do so, the magistrate judge ordered quantification of their damages by a date certain — an opportunity to put Pacific Rail on notice of their claims which the plaintiffs simply did not seize.
In these circumstances, then, the district court did not abuse its discretion in striking *833 the plaintiffs’ front pay awards at the conclusion of the first trial. Rather than usurp the district court’s role as presider over the second trial, we hold only that on remand it will be left to the sound discretion of the district court to determine in the interests of fairness and justice whether to allow any new claims.
B.
Although the plaintiffs cannot claim front pay on remand, they will be permitted to seek emotional distress damages, contrary to the rulings of the magistrate judge and district court. This case was originally bifurcated so that liability would be tried separately from damages. The parties initially prepared their pretrial order with that in mind, but for some reason, presumably discussed during a pretrial conference with the magistrate judge, it was decided that the case would not be bifurcated. App. at 64. Because they had apparently only envisioned a trial on liability prior to this, plaintiffs then sought permission to list exhibits regarding damages and to amend the pretrial order to list additional witnesses, who happened to be doctors, to support their claims of emotional distress damages. App. at 2746, 2761. The magistrate judge permitted plaintiffs to include additional exhibits to support their claims for pecuniary damages (to which Pacific Rail did not object), but denied plaintiffs’ request to name the doctors as witnesses. In conjunction with that decision, the magistrate judge struck the plaintiffs’ claims for emotional distress damages because he believed that “competent medical testimony of an expert nature ... as to the causation of any emotional distress” was required.[13] App. at 2762. The district court affirmed this ruling when plaintiffs appealed.
Plaintiffs argue that their claims for emotional distress damages should not have been stricken. In reviewing the magistrate judge’s decision to this effect, the district court had to determine whether that decision was “clearly erroneous or contrary to law.” 28 U.S.C. § 636(b)(1)(A); Cipollone v. Liggett Group, Inc., 785 F.2d 1108, 1120 (3d Cir.1986). The question before the magistrate judge, the district court and us does not, as Pacific Rail argues, arise in the context of Rule 701 of the Federal Rules of Evidence (regarding opinion testimony by lay witnesses) but is instead a matter of New Jersey law concerning whether expert evidence is needed to prove emotional distress damages in this type of ease. We will thus determine whether the magistrate judge’s decision to strike plaintiffs’ claims for emotional distress damages was contrary to law. Cf. Bolden v. Southeastern Pennsylvania Transp. Auth., 953 F.2d 807, 829 n. 30 (3d Cir.1991) (whether district court properly dismissed punitive damages request is question of law subject to plenary review).
“Emotional stress” damages may be recovered under the LAD. N.J.Stat.Ann. 10:5-3; Milazzo v. Exxon Corp., 243 N.J.Super. 573, 580 A.2d 1107 (1990). New Jersey courts require expert testimony to prove the causal link between a claimed injury and the tortious act alleged when the plaintiff is claiming that he or she suffered subjective injury (such as pain, humiliation, emotional distress) that is not obviously related to an identifiable injury. Kelly v. Borwegen, 95 N.J.Super. 240, 243-44, 230 A.2d 532, 534 (1967). This requirement is based on a concern that “a jury should not be allowed to speculate on the issue of causation. If the question of causal relation is so esoteric that lay minds cannot form any intelligent judgment about it without expert aid an opinion from an expert may be required.” Bushman v. Halm, 798 F.2d 651, 659 (3d Cir.1986) (applying New Jersey law and citing 2 F. Harper & F. James, Jr. The Law of Torts § 20 at 15-16, § 21 at 1116-17 (1956)).
The requirement is not without boundaries, however. In Bushman, for ex *834 ample, we held that a “plaintiff is not required under New Jersey law to submit expert medical opinion on the element of legal causation to establish a prima facie case of negligence.” Bushman, 798 F.2d at 653. In that case, a plaintiff whose truck had collided with a United States Postal Service jeep sued the government under the Federal Tort Claims Act alleging negligence. The trial court granted summary judgment to the government because the plaintiff had alleged only “soft tissue injuries” (i.e., he was seeking recovery only for pain and suffering related to an injury to his knees, which had struck the dashboard in the accident), and his expert witness had not opined that his pain was caused by the accident. We reviewed Kelly and Menza v. Diamond Jim’s, Inc., 145 N.J.Super. 40, 366 A.2d 1006 and determined that New Jersey law requires a case-by-case analysis to determine when expert testimony is required to buttress subjective complaints of pain and suffering. The key question is whether there is evidence tending show some objective basis for the pain. If there is, no expert testimony is needed because a jury is competent to decide whether there exists a causal connection.
In Bushman,
plaintiff testified that his legs were pain-free prior to the accident. However, he stated that he experienced recurrent pain in his knees and surrounding soft tissues after they contacted his truck’s dashboard during the accident_ Plaintiff has adequately drawn into question the objective nature of his pain and suffering through his own sworn statements. The pain and suffering plaintiff experienced immediately after the accident is directly linked to objectively identifiable symptoms of soft tissue injury verified in the medical evidence. Thus, the lower court erred when it concluded that plaintiffs injuries were “not obviously related to an identifiable injury.”
Bushman, 798 F.2d at 660.
Here, we are not apprised of any objective evidence supporting the plaintiffs’ claims of emotional distress. Neither the magistrate judge, nor the district court, nor this court has been presented any evidence of “objectively identifiable symptoms” upon which the plaintiffs rely to support their claims. Absent such evidence, the alleged emotional distress in this case seems to resemble Menza and Kelly. (In Menza, the plaintiff claimed chest pain 21 months after a fall, and in Kelly, the plaintiff alleged permanent difficulty in sleeping, walking, climbing steps and breathing after a car accident.) Plaintiffs allege subjective claims of emotional distress, but we have no objectively identifiable, medically verified symptoms as the plaintiff had in Bushman.
On the other hand, the magistrate judge’s decision was made well before trial, when no evidence had yet been presented. Some of the plaintiffs may be able to establish objectively identifiable symptoms from which a jury could infer causation even in the absence of an expert witness. If, as to some or all plaintiffs, there exists other evidence tending to establish causation, such as objectively identifiable symptoms appearing close in time to Pacific Rail’s takeover at North Bergen, then the plaintiffs who presented such evidence might not need to present expert evidence to reach the jury. Thus, the magistrate judge’s wholesale dismissal of all the plaintiffs’ claims for emotional distress damages without knowing anything more about each plaintiffs case was “contrary to law.” 28 U.S.C. § 636(b)(1)(A). Plaintiffs’ claims for emotional distress damages are to be reinstated on remand.
C.
To further assist the district court on remand, we will also review plaintiffs’ allegations that the court erred in dismissing the cases of five former PTL workers. We will affirm its dismissal of all but one of those plaintiffs. On remand, that one plaintiffs claims are to be reinstated for consideration of whether his cause of action survived his death.
1.
Four of these plaintiffs’ cases are easily addressed. The district court properly dismissed the cases of David Quaid, John Gugliotta, Andrew Hennessey and Adam Lukasweski because the evidence was insuffi *835 cient to support judgment for them as a matter of law.
Quaid’s ease falters because of insufficient evidence from which a jury could conclude that he was injured. Evidence at trial revealed that a Pacific Rail representative called Quaid three times to offer him a job, but Quaid did not accept. The first time, September 1, Quaid told the representative that he was “number ten” on the list (presumably the union’s seniority list) and that Pacific Rail would have to ask the nine men or women above him on the list before he would accept a job. App. at 729-30. The second time, September 3, Quaid reiterated this and told the Pacific Rail representative he would get back to him. App. at 730-31. The third time, in the third week in September, the representative again told Quaid that Pacific Rail would like Quaid to work for the company. Quaid said that he would work for Pacific Rail but did not accept the job because of ongoing union proceedings. Specifically, he stated that he did not want to “jump[] before [he] knew where [he] was going to land and then wind[ ] up in limbo.” App. at 737. Quaid stated at trial that he “never, never refused employment,” “[n]ever turned [Pacific Rail] down,” that “[Pacific Rail understood] that I wanted the job,” and that “[a]ll I did was to ask [Pacific Rail] for time. But there was [sic] never any refusals.” App. at 728. Quaid’s explanations, however, fail to negate the fact that he did not accept employment that was offered to him and cannot be considered to have been injured by Pacific Rail’s actions when Pacific Rail actually offered him employment.
Gugliotta, Hennessey and Lukasweski present similar situations. These three plaintiffs were receiving workers’ compensation payments for medical conditions at the time Pacific Rail took over at North Bergen. They could not have been denied jobs because of their age; they were not available to occupy positions when Pacific Rail needed them. The only argument the plaintiffs advance in opposition to this reasoning is a contention that Pacific Rail would have offered them jobs even if they were injured but for age discrimination. As evidence for this proposition, they note that a Pacific Rail representative, upon seeing Gugliotta in early September, asked Gugliotta if he was ready to work, thus impliedly offering him a job. The representative’s statement, however, was not exactly a job offer but was more in the nature of an inquiry about when Gugli-otta might be ready to work. App. at 1356. Moreover, Gugliotta refused (id.), so even if it was a job offer, that merely transforms his particular case into one which resembles Quaid’s more than Hennessey’s and Lu-kasweski’s. Dismissal of their eases was not error.
2.
Finally, we address the case of the estate of plaintiff A1 Armetta, who passed away in December, 1991, after commencement of this lawsuit. Plaintiffs’ attorneys apparently learned of Armetta’s death in August, 1992, and defense counsel was notified either then or on the first day of trial in mid-September, 1992. Plaintiffs’ counsel never filed a “suggestion of death” or served formal written notice of the death on defense counsel or the court.
At trial, upon learning of Armetta’s death, the district court ruled that Armetta should be stricken from the case. At the close of plaintiffs’ case, in discussing directed verdict matters, plaintiffs’ counsel argued that Ar-metta’s estate should be considered a plaintiff for purposes of claiming damages until the time of his death. The court refused because “there ha[d] been no substitution of Mr. Armetta’s estate in this matter.” App. at 964. The district court judge stated that he did not “know that [Armetta’s] estate has an interest in this matter,” and pointed out that there was no “motion nunc pro tune or ... to relax the rules” about Armetta. App. at 1018. Plaintiffs’ counsel stated that he had spoken with Armetta’s widow, who had said she wanted to continue the lawsuit. Id. The court refused to accept this representation and, the next day, denied counsel’s oral motion to substitute Mrs. Armetta for her husband, saying that plaintiffs had produced no proof that Mrs. Armetta was the executrix of Armetta’s estate. It rejected plaintiffs’ counsel’s offer to supply such proof. Id. at 1023-26. Specifically, the district court de *836 nied the motion because (1) it questioned whether this cause of action survived Armet-ta’s death, (2) “[t]here has been no showing of excusable neglect ... [or] actions on the part of the defendant which would put the plaintiff in a prejudicial position,” (3) there was no proof that Mrs. Armetta was the executrix of Armetta’s estate, and (4) it was too late to move to substitute Armetta’s estate as a plaintiff because the defendant had had no chance to conduct discovery concerning “whoever the estate is” or “to do anything that is necessary to prepare for trial.” Id. at 1029-30.
Rule 25(a)(1) provides:
If a party dies and the claim is not thereby extinguished, the court may order substitution of the proper parties. The motion for substitution may be made by any party or by the successors or representatives of the deceased party and, together with the notice of hearing, shall be served on the parties as provided in Rule 5 and upon persons not parties in the manner provided in Rule 4 for the service of a summons, and may be served in any judicial district. Unless the motion for substitution is made not later than 90 days after the death is suggested upon the record by service of a statement of the fact of the death as provided here for the service of the motion, the action shall be dismissed as to the deceased party.
Fed.R.Civ.P. 25(a)(1). Thus, if a party dies, ideally his or her attorney will file a “suggestion of death” with the court and serve it upon all parties. After the suggestion of death is filed, a 90-day countdown begins. Within 90 days, some other party or the executor or administrator of the deceased must move for substitution of the estate for the deceased, or the deceased’s case will be dismissed. Decisions on the motion for substitution are within the trial court’s discretion. Fed.R.Civ.P. 25(a) (“the court may order substitution”); Advisory Committee Note to 1963 Amendments.
Nothing was ideal here. Plaintiffs’ counsel served neither a formal suggestion of death nor a formal motion for substitution. That does not mean, however, that the district court properly denied the motion made at trial to substitute Armetta’s estate as the plaintiff claiming damages on his behalf. Nothing in Rule 25 says that a suggestion of death must be made or sets forth a time frame for doing it. In circumstances in which the deceased’s counsel only recently learned of the death, failure to file a suggestion of death within a particular period of time does not constitute sufficient grounds for refusing such a motion.
Moreover, the district court’s denial on the basis that the plaintiff did not make a formal motion, filed and served in accordance with Rule 25, also was, in our view, an overly strict interpretation of the rule. We have indicated a willingness to permit lesser attempts to suffice. See Anderson v. Republic Motor Inns, Inc., 444 F.2d 87 (3d Cir.1971) (reversing a district court’s dismissal of a case for failure to comply with Rule 25(a) because the plaintiffs attorney had noted in his pretrial memorandum that the wife, as executrix of the estate, intended to continue as substitute plaintiff). In doing so, we have emphasized that our lenient view would apply only in “an extraordinary case, and that departure from the requirements of the Federal Rules is not to be permitted routinely,” Anderson, 444 F.2d at 89, but this case strikes us as extraordinary. Here, the district court ruled that plaintiffs’ counsel had failed to move for substitution within an appropriate time, yet the time period for so moving had not yet begun to run because death had not yet been suggested on the record. Cf. 7C C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 1955 at 544 (2d ed. 1986) (“the time does not run until the death is suggested on the record”). Concerns about prejudice to the defendant are not well-placed in this instance, for the record reveals that defense counsel was notified of Armetta’s death very shortly after plaintiffs’ counsel became aware of it. And, contrary to the district court’s view, Rule 25 contains no “excusable neglect” standard by which the district court is to gauge its exercise of discretion. We fully understand why the court might desire some written proof of Armetta’s death and of the estate’s desire to proceed with his case, but we see no reason not to permit plaintiffs *837 counsel an opportunity to produce such proof before deciding the motion.
Thus, we cannot find that the district court exercised sound discretion on this issue. Ar-metta’s claims should be re-examined on remand, and plaintiffs’ counsel is to be given an opportunity to provide written proof of Ar-metta’s death, his 'widow’s relationship to his estate and the estate’s wishes with regard to proceeding in this lawsuit. Also on remand, however, the parties are to address the district court’s first concern, namely whether Armetta’s LAD claim survived his death. See Fed.R.Civ.P. 25(a)(1) (substitution permitted “[i]f a party dies and the claim is not thereby extinguished”). This issue is a matter of state law, cf. Ransom v. Brennan, 437 F.2d 513, 520 (5th Cir.1971); see N.J.Stat. Ann. 2A:15-3, which we decline to resolve at this stage because the parties have neither briefed nor argued it either here or before the district court.
V.
In conclusion, we predict that the New Jersey Supreme Court would accept the Supreme Court’s decision in Hicks as clarifying LAD law, just as Hicks did federal anti-discrimination law. Our conclusion to that effect necessitates a remand of this case for retrial in accordance with this opinion. On remand, it will be within the trial court’s discretion whether to allow claims for front pay, and plaintiffs’ claims for emotional distress are reinstated consistent with this opinion. In addition, the claims of deceased plaintiff Al Armetta are to be reinstated so that the district court may consider whether Armetta’s claims survived his death and, if so, so that his claims may be tried along with those of the other plaintiffs.

. Plaintiffs at trial disputed both the sincerity of Pacific Rail’s concern and the accuracy of Pacific Rail’s characterization of the PTL employees at North Bergen.

. Curiously, the record is somewhat ambiguous as to whether three or four additional employees were hired after September 1. Plaintiffs’ Exhibit 10 indicates that Pacific Rail hired a total of 25 persons. The parties agree that 21 were hired prior to September 1. That would leave four to be hired after September 1, but, as discussed in the text, the parties specifically discuss only three employees hired after that date. The discrepancy is immaterial for our purposes, as we are certain it will be clarified on remand.

. The McDonnell Douglas analysis was derived from McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). See also Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Although McDonnell Douglas itself in *826 volved allegations of intentional (disparate treatment) discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, the shifting burden analysis with which the case name is now synonymous also has been applied in section 1983 cases, section 1981 cases and age discrimination cases. See Hicks, - U.S. at --- n. 1, 113 S.Ct. at 2746-47 n. 1; Seman v. Coplay Cement Co., 26 F.3d 428, 432 n. 7 (3d Cir. June 8, 1994); Geary v. Visitation of the Blessed Virgin Mary Parish Sch., 7 F.3d 324, 329 & n. 4 (3d Cir.1993).

. Pacific Rail requested a jury instruction explaining that even if the jury rejected Pacific Rail's rationale as unsupported by the evidence or false, the jury would nevertheless still need to find that the plaintiffs met their burden of proving wrongful discrimination. Suppl.App. at 2799. The district court did not give this instruction.

. Pacific Rail contends that plaintiffs are es-topped from arguing that Hicks does not apply because the plaintiffs contended throughout this litigation that New Jersey courts generally follow federal law in this area. Plaintiffs certainly have consistently taken the position that the standards and allocations of proof applicable to federal Title VII cases apply in cases involving the LAD. But on these facts we cannot say plaintiffs are estopped from arguing that Hieles does not apply. Trial took place in September, 1992, and post-trial motions were decided in March and April, 1993. Hides was not decided until June, 1993. Until then, our position on this issue, which the district court was bound to follow, was one the plaintiffs believed the New Jersey Supreme Court would also follow. The fact that the United States Supreme Court has since disavowed our position should not foreclose the plaintiffs from arguing that the New Jersey Supreme Court ■ might nonetheless decide to adopt the approach *827 taken in Title VII cases in this circuit before Hicks.

. The New Jersey legislature has provided:
All persons shall have the opportunity to obtain employment ... without discrimination because of race, creed, color, national origin, ancestry, age, marital status, affectional or sexual orientation, familial status, or sex, subject only to conditions and limitations applicable alike to all persons. This opportunity is recognized and declared to be a civil right.
NJ.Stat.Ann. 10:5-4. It has clearly stated the intent behind the LAD within the statute itself:
The Legislature finds and declares that practices of discrimination against any of its inhabitants, because of race, creed, color, national origin, ancestry, age, sex, affectional or sexual orientation, marital status, familial status, liability for service in the Armed Forces of the United States, or nationality, are matters of concern to the government of the State, and that such discrimination threatens not only the rights and proper privileges of the inhabitants of the State but menaces the institutions and foundation of a free democratic State; provided, however, that nothing in this expression of policy prevents the making of legitimate distinctions between citizens and aliens when required by federal law or otherwise necessary to promote the national interest.
The Legislature further declares its opposition to such practices of discrimination ... in order that the economic prosperity and general welfare of the inhabitants of the State may be protected and ensured.
The Legislature further finds that because of discrimination, people suffer personal hardships, and the State suffers a grievous harm. The personal hardships include: economic loss; time loss; physical and emotional stress; and in some cases severe emotional trauma, illness, homelessness or other irreparable harm resulting from the strain of employment controversies; relocation, search and moving difficulties; anxiety caused by lack of information, uncertainty, and resultant planning difficulty; career, education, family and social disruptions; and adjustment problems, which particularly impact on those protected by this act. Such harms have, under the common law, given rise to legal remedies, including compensatory and punitive damages. The Legislature intends that such damages be available to all persons protected by this act and that this act shall be liberally construed in combination with other protections available under the laws of this State.
NJ.Stat.Ann. 10:5-3.

. We acknowledge that the New Jersey Supreme Court has not always been entirely clear on this point. In Peper, the case in which it decided to adopt the McDonnell Douglas shifting burden scheme, the court stated in dicta that it agreed with the statements of a federal judge who described the McDonnell Douglas scheme as shifting the burden of proof, rather than simply of production, to the defendant once a prima facie case has been made out. Peper, 77 N.J. at 84, 389 A.2d at 480. The focus of Peper, however, was on the plaintiff's inability to establish a pri-ma facie case. That and numerous statements since by the New Jersey Supreme Court and superior courts confirming that the burden of proof does not shift (e.g., Goodman v. London Metals Exch., Inc., 86 N.J. 19, 429 A.2d 341 (1981); Kearny, supra), convince us that this single statement in Peper cannot serve as a basis for concluding that the court would refuse to incorporate the principles of Hiclts into the law of the LAD.
Similarly, statements in Jamison v. Rockaway Twp. Bd. of Educ., 242 N.J.Super. 436, 577 A.2d 177 (1990), do not sway our view of the burden placed on a plaintiff asserting a straightforward LAD claim. In that case, the New Jersey Superi- or Court referred extensively to a decision of the Court of Appeals for the Ninth Circuit, Wrighten v. Metro. Hosp., Inc., 726 F.2d 1346 (9th Cir.1984), describing the McDonnell Douglas formulation applicable in retaliatory discharge cases. The Jamison cotut cited Wrighten as providing that an employee asserting a retaliatory discharge may "show by preponderating evidence that a discriminatory intent motivated the employer’s action" by “proving that the articulated reason is a pretext for the retaliation or that a discriminatory reason more likely motivated the employer.” Jamison, 242 N.J.Super. at 445, 577 *829 A.2d at 182 (emphasis added). Doing so, the court added, creates "a presumption ... that the adverse employment action was the product of improper retaliatory intent.... Then, the employer must prove by the preponderance of the evidence that the adverse action would have been taken regardless of retaliatory intent.” Id. at 445-46, 577 A.2d at 182. The shifting of the ultimate burden in a retaliatory discrimination case does not necessarily imply that the New Jersey Supreme Court would advocate any shift or lessening of the burden in a straightforward failure-to-hire case.

. Rule 301 provides:
In all civil actions and proceedings not otherwise provided for by Act of Congress or by these rules, a presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof in the sense of the risk of nonpersuasion, which remains throughout the trial upon the party on whom it was originally cast.

. The rule provides:
Except as otherwise provided in Rule 303 or by other law, a presumption discharges the burden of producing evidence as to a fact (the presumed fact) when another fact (the basic fact) has been established.
If evidence is introduced tending to disprove the presumed fact, the issue shall be submitted to the trier of fact for determination unless the evidence is such that reasonable persons would not differ as to the existence or nonexistence of the presumed fact. If no evidence tending to disprove the presumed fact is presented, the presumed fact shall be deemed established if the basic fact is found or otherwise established. The burden of persuasion as to the proof or disproof of the presumed fact *830 does not shift to the party against whom the presumption is directed unless otherwise required by law. Nothing in this rule shall preclude the judge from commenting on inferences that may be drawn from the evidence.

. Rule 301 replaced N.J.R.Evid. 14, cited by the PTL employees, effective July 1, 1993. Commentary to it indicates that Rule 301 reflects established New Jersey law.

. The employees argue that, ”[a]t a minimum, if the New Jersey Supreme Court were to follow Hicks it would only apply its holding prospectively.” Appellees/Cross-Appellants’ Brief at 16. Under New Jersey law, “Prospective application is appropriate when a decision establishes a new principle of law by overruling past precedent or by deciding an issue of first impression.” Montells v. Haynes, 133 N.J. 282, 295, 627 A.2d 654 (1993). As explained above, the New Jersey Supreme Court would not be overturning past precedent or deciding a new issue by following the Hicks approach; it would merely be clarifying prior decisions. There is no reason to believe that the New Jersey Supreme Court would choose to apply such a decision only prospectively-

. Specifically, given that the judgment will be vacated and the case retried, we see no reason to decide whether the trial court erred in (1) refusing to order remittitur of some plaintiffs’ backpay awards, (2) awarding plaintiffs prejudgment interest, or (3) refusing to order reinstatement. We may quickly dispose of one issue raised by Pacific Rail which still must be resolved. Pacific Rail argues that the district court erred in refusing to dismiss the cases of plaintiffs Phyllis Lindh, Sal Petruzzelli and Ed Dechert for failure to establish a prima facie case. After reviewing the record, we do not agree that the district court erred. Depending upon credibility judgments, which we are in no position to make, the evidence may be sufficient to support a verdict for each of these plaintiffs.

. Significantly, the plaintiffs were not offering the doctors as expert witnesses, for they had no expert reports from which the doctors could state expert opinions. App. at 2759. Instead, they intended that the doctors would testify as lay witnesses describing what they had observed. Thus, this is not a case in which a denial of a motion to amend to add the doctors as witnesses resulted in the lack of evidence for which the claims were dismissed. Refusing to permit the doctors to testify merely lessened the number of lay witnesses who would be testifying for plaintiffs. It did not deprive them of expert testimony.